## UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| In Re: Jerry L. Rhoads & Sharon K. Rhoads, | ) ) ) ) | **Chapter 11** **No. 14-00215-als11** **Hon. Anita L. Shodeen** |
| Debtors. | ) | |

### SECOND NON-MATERIAL MODIFICATION OF DEBTORS' FIRST AMENDED PROPOSED COMBINED LIQUIDATING PLAN OF REORGANIZATION AND DISCLOSURE STATEMENT DATED JULY 11, 2014

Jerry L. and Sharon K. Rhoads (the "Debtors") make the following second non-material modification of their "Debtor's First Amended Proposed Combined Liquidating Plan of Reorganization and Disclosure Statement Dated July 11, 2014" (the "Plan").

1. Section III – B 4 g of the Plan, which originally provided as follows:

> **g. Disputed Claims.** The Disputed Claims are (i) Claims that have been improperly asserted against the Debtors relating to indebtedness of one or more of the Debtors' corporate entities and not the Debtors, or (ii) Claims with regard to which the Debtors otherwise object.

is hereby modified to now read as follows:

> **g. Disputed Claims.** The Disputed Claims are (i) Claims that have been improperly asserted against the Debtors relating to indebtedness of one or more of the Debtors' corporate entities and not the Debtors, or (ii) Claims with regard to which the Debtors otherwise object.
>
> Included among the Disputed Claims with regard to which the Debtors intend to file an objection is a claim filed by "Karen Smith/Estate of JoAnn Thompson" in the amount of $1 million arising from the alleged wrongful death of JoAnn Thompson while Ms. Thompson was a patient of the Arkansas Nursing Home. The Debtors were named in four wrongful death suits in Arkansas, but the Thompson claim is the only claim filed in the Debtors' bankruptcy case. The Debtors dispute this claim because they believe that under controlling Arkansas law they are not personally liable for the alleged wrongful death of Ms. Thompson because (a) the Arkansas Nursing Home, where the alleged actions took place resulting in Ms. Thompson's death, was owned and operated by All American Care Centers, Inc. and not the Debtors personally, and (b) the Debtors did not personally take any actions resulting in Ms. Thompson's death.

2. Section IV – B 2 of the Plan, which originally provided as follows:

> **2  Treatment of Class 2 [Tax Claims]:** In full and complete satisfaction of all Class 2 Claims, after the allowed Class 1 Administrative Claims have been paid in full,

the Class 2 Creditors will be paid from the Plan Disbursement Account described in paragraph IV D 6 below, as funds become available therein until the allowed amount of their Class 2 Claims (including interest that will continue to accrue on the allowed Class 2 Claims at the applicable statutory rate for such Tax Claims) has been paid in full. The Debtors believe there are no Class 2 Claims. The Class 2 Claims are not impaired.

is hereby modified to now read as follows:

    **2.**   **Treatment of Class 2 [Tax Claims]:**  In full and complete satisfaction of all Class 2 Claims, after the allowed Class 1 Administrative Claims have been paid in full, the Class 2 Creditors will be paid from the Plan Disbursement Account described in paragraph IV D 6 below, as funds become available therein until the allowed amount of their Class 2 Claims (including interest that will continue to accrue on the allowed Class 2 Claims at the applicable statutory rate for such Tax Claims) has been paid in full. The Debtors believe there are no Class 2 Claims. The Class 2 Claims are not impaired.

Notwithstanding any other provision in the Plan or in the order confirming the Plan, any unpaid Iowa tax liabilities (including penalties and interest) that would be non-dischargeable pursuant to the provisions of 11 U.S.C. § 523, shall also be excepted from discharge under the confirmed Plan.

3.   Section IV – B 4 of the Plan, which originally provided as follows:

    **4.**   **Treatment of Class 4 [Illinois Home Secured Claim]:**  Upon the Effective Date the Debtors will (a) make the repairs necessary to the Illinois Home to repair the water damage, the cost of which is expected to be approximately $25,000, (b) resume making monthly mortgage payments to the Class 4 Creditor, and (c) after the Water Damage has been repaired, list the Illinois Home for sale with an Illinois broker at a listing price and upon the conditions described further in Section IV D 2 below.  If the Illinois Home has not been sold after 12 months, it will be listed with an auctioneer who will conduct an auction sale of the property no later than 14 months after the Effective Date. The net proceeds from the sale of the Illinois Home, after brokerage fees, closing costs and mortgages on the property have been paid in full will be used to fund the Plan. The Class 4 Claim is impaired.

is hereby modified to now read as follows:

    **4.**   **Treatment of Class 4 [Illinois Home Secured Claim]:**  Upon the Effective Date the Debtors will (a) make the repairs necessary to the Illinois Home to repair the water damage, the cost of which is expected to be approximately $25,000 and said repairs will be completed within 45 days of the Effective Date, (b) resume making monthly mortgage payments to the Class 4 Creditor, and (c) after the Water Damage has been repaired, list the Illinois Home for sale with an Illinois broker at a listing price and upon the conditions described further in Section IV D 2 below. If the Illinois Home has not been sold after 12 months, it will be listed with an auctioneer who will conduct an auction sale of the property no later than 14 months

after the Effective Date. The net proceeds from the sale of the Illinois Home, after brokerage fees, closing costs and mortgages on the property have been paid in full will be used to fund the Plan. The Class 4 Claim is impaired.

Notwithstanding the foregoing, the Debtors will not be required to sell the Illinois Home if (a) they have cured all arrearages under the first mortgage on the Illinois Home held by the Class 4 Creditor and (b) the Debtors have made all of the payments otherwise called for under the Plan.

In the event that within 14 months from the Effective Date (a) the Illinois Home is not sold for an amount sufficient to fully satisfy the Illinois Home Secured Claim and (b) the Debtors have not cured all arrearages under the first mortgage on the Illinois Home held by the Class 4 Creditor, the automatic stay imposed pursuant to 11 U.S. C. 362 will lift without further order of the Court to enable the Class 4 and Class 5 Creditors to pursue their state court foreclosure remedies with regard to their mortgages on the Illinois Home.

4.  Section IV – D 2 of the Plan, which originally provided as follows:

**Sale of Illinois Home**.  Upon the Effective Date Debtors will repair property at their cost, thereby increasing the value of the property above the amount owed to Seterus. The Debtors will resume making monthly mortgage payments to Seterus, which when added to the enhanced value of the Illinois Home after it has been repaired will result in the Seterus claim being "adequately protected."

The Illinois Home will be listed for sale with a broker at an initial agreed asking price of $450,000.  Until the Illinois Home is under contract for sale, the Debtors will reduce the listing price for the property by $10,000 every 45 days until the earlier of (a) the property being sold, or (b) 12 months after the Plan Effective Date. The Debtors will have the right to make additional reductions in the asking price for the property, provided that they will not reduce the asking price of the property below the aggregate amount owed to Seterus and FTB (if FTB exercises its option to retain its Reduced FTB Jr. Mtg.) without the written consent of Seterus and FTB.

If the Illinois Home has not been sold by the first anniversary of the Effective Date, the Illinois Home will be placed with an auctioneer who will thereafter conduct an auction of the property (to be conducted no later than 60 days thereafter), at which Seterus and FTB (if FTB exercises its option to retain its Reduced FTB Jr. Mtg.) will respectively be allowed to credit bid the amount of their mortgage claims.

The net proceeds of the sale of the Illinois Home, either through a broker's sale or auction, will be first remitted to Seterus and then FTB (if FTB exercises its option to retain its Reduced FTB Jr. Mtg.) until their claims are paid in full, and the balance, if any, will be remitted to the Debtors, who will make a pro-rata distribution of such surplus proceeds to the Debtors' Class 9 Creditors.

is hereby modified to now read as follows:

**Sale of Illinois Home**.    Upon the Effective Date Debtors will repair property at their cost, thereby increasing the value of the property above the amount owed to Seterus.  Said repairs will be completed within 45 days of the Effective Date, The Debtors will resume making monthly mortgage payments to Seterus, which when added to the enhanced value of the Illinois Home after it has been repaired will result in the Seterus claim being "adequately protected."

The Illinois Home will be listed for sale with a broker at an initial agreed asking price of $450,000.  Until the Illinois Home is under contract for sale, the Debtors will reduce the listing price for the property by $10,000 every 45 days until the earlier of (a) the property being sold, or (b) 12 months after the Plan Effective Date.  The Debtors will have the right to make additional reductions in the asking price for the property, provided that they will not reduce the asking price of the property below the aggregate amount owed to Seterus and FTB (if FTB exercises its option to retain its Reduced FTB Jr. Mtg.) without the written consent of Seterus and FTB.

If the Illinois Home has not been sold by the first anniversary of the Effective Date, the Illinois Home will be placed with an auctioneer who will thereafter conduct an auction of the property (to be conducted no later than 60 days thereafter), at which Seterus and FTB (if FTB exercises its option to retain its Reduced FTB Jr. Mtg.) will respectively be allowed to credit bid the amount of their mortgage claims.

The net proceeds of the sale of the Illinois Home, either through a broker's sale or auction, will be first remitted to Seterus and then FTB (if FTB exercises its option to retain its Reduced FTB Jr. Mtg.) until their claims are paid in full, and the balance, if any, will be remitted to the Debtors, who will make a pro-rata distribution of such surplus proceeds to the Debtors' Class 9 Creditors.

Notwithstanding the foregoing, the Debtors will not be required to sell the Illinois Home if (i) they have cured all arrearages under the first mortgage on the Illinois Home held by the Class 4 Creditor and (ii) the Debtors have made all of the payments otherwise called for under the Plan.

In the event that within 14 months from the Effective Date (i) the Illinois Home is not sold for an amount sufficient to fully satisfy the Illinois Home Secured Claim and (ii) the Debtors have not cured all arrearages under the first mortgage on the Illinois Home held by the Class 4 Creditor, the automatic stay imposed pursuant to 11 U.S. C. 362 will lift without further order of the Court to enable the Class 4 and Class 5 Creditors to pursue their state court foreclosure remedies with regard to their mortgages on the Illinois Home.

5.  Section IV – D 3 of the Plan, which originally provided as follows:

> **3.  Sale of Nursing Homes or the Debtors' Interests Therein**.  The Debtors will actively market the Nursing Homes or their shares in the Nursing Homes, in connection with which the Debtors believe, but cannot guaranty, that they will realize sufficient proceeds to satisfy all of the Claims of their Creditors.  If the Nursing Homes or the Debtors' interests therein have not been sold by the fourth anniversary of the Effective Date, the Nursing Homes or the Debtors' interests will be placed with an auctioneer who will thereafter conduct an auction of the Nursing Homes or the Debtors' interests (to be conducted no later than 180 days thereafter), at which the holders of the liens upon the Nursing Homes and/or the Debtors' interests therein will be allowed to credit bid the amount of their Allowed Secured Claims.  Upon the sale of the Nursing Homes or the Debtors' interest therein, the Debtors will use the net proceeds they receive from such sale to pay the balance of the payments called for under their Plan.

is hereby modified to now read as follows:

> **3.  Sale of Nursing Homes or the Debtors' Interests Therein**.  The Debtors will actively market the Nursing Homes or their shares in the Nursing Homes, in connection with which the Debtors believe, but cannot guaranty, that they will realize sufficient proceeds to satisfy all of the Claims of their Creditors.  If the Nursing Homes or the Debtors' interests therein have not been sold by the fourth anniversary of the Effective Date, the Nursing Homes or the Debtors' interests will be placed with an auctioneer who will thereafter conduct an auction of the Nursing Homes or the Debtors' interests (to be conducted no later than 180 days thereafter), at which the holders of the liens upon the Nursing Homes and/or the Debtors' interests therein will be allowed to credit bid the amount of their Allowed Secured Claims.  Upon the sale of the Nursing Homes or the Debtors' interest therein, the Debtors will use the net proceeds they receive from such sale to pay the balance of the payments called for under their Plan.
>
> The Nursing Homes have recently entered into a letter of intent (the "LoI"), pursuant to the terms of which the Nursing Homes' assets will be sold (the "NH Asset Sale") for an aggregate purchase price of $8.5 million.  The proceeds of the sale of the NH Asset Sale will be (a) first used to fully pay off all of the indebtedness of the Nursing Homes, including the Affiliate Guaranty Claims, (b) then used to pay the taxes that will be incurred in connection with the NH Asset Sale, including those taxes which would become due and owing by the Debtors arising from the NH Asset Sale, and (c) finally be distributed to the Debtors and the other owners of the Nursing Homes.  While the exact amount of the net proceeds to be distributed to the Debtors from the NH Asset Sale has yet to be calculated, those proceeds are expected to be more than sufficient to fully fund all of the payments called for under the1 Plan.

6. A Copy of the Second Modified Plan is attached hereto as **Exhibit A**.

Respectfully submitted,
Jerry L. and Sharon K. Rhoads

By:    */s/ Chester H. Foster, Jr.*
One of their attorneys

Chester H. Foster, Jr., Attorney for Debtors
Foster Legal Services, PLLC
3825 W. 192nd St.
Homewood, IL 60430
(708) 799-6300
ARDC #03122632

H. J. DANE, Attorney for Debtors
IA#9999913/IL#6182600
KSTT Place, 1111 E. River Drive
Davenport, IA 52803
Phone: (563) 326-0006

## CERTIFICATE OF SERVICE

I certify that on the 2nd day of September, 2014, I caused the foregoing to be filed with the Clerk of the Bankruptcy Court using the CM/ECF system, and I further certify that on the same date I mailed a copy of the document by US mail to each of the Debtors' creditors as listed on the attached service list.

*/s/ Chester H. Foster, Jr*

Rhoads Service List
14-00215-als11

1st Community Bank of Muscatine
Community Bank & Trust
615 Cedar St.
Muscatine, IA 52761

American Express Bank, FSB
c/o Becket and Lee LLP
P.O. Box 3001
Malvern, PA 91355-0701

Bank of America
P.O. Box 861001
Dallas, TX 75285-1001

Bank of America
P.O. Box 982238
El Paso, TX 79998-2238

Bank of America
Attn: Corr. Unit/CA6-919-02-41
P.O. Box 5170
Simi Valley, CA 93062

Barclays Bank Delaware
Bankruptcy
P.O. Box 8801
Wilmington, DE 19899

Benjamin W. Hopkins
1350 NW 138th St.
Suite 100
Clive, IA 50325-8308

Billy and Diann Simmons
c/o Eric D. Wewers
415 N. McKinley St., #1000
Little Rock, AR 72205

Cach LIC/Square Two Financial
Attn: Bankruptcy
4340 S. Monaco St., 2nd Fl.
Denver, CO 80237

Capital 1 Bank
Attn: Bankruptcy Dept.
P.O. Box 30285
Salt Lake City, UT 84130

Capital One Bank (USA), N.A.
P.O. Box 71083
Charlotte, NC 28272-1083

Caregiver Mgmt Systems, Inc.
2 Westwind
Hawthorne Woods, IL 60047

Cerastes, LLC
c/o Weinstein, Pinson & Riley, PS
2001 Western Ave., #400
Seattle, WA 98121

Chase
P.O. Box 78420
Phoenix, AZ 85062

Citibank
P.O. Box 790034
St. Louis, MO 63179-0034

Comenity Bank/J Crew
Attn: Bankruptcy
P.O. Box 182686
Columbus, OH 43218

Dr. Roudachevski
c/o Janet L. Pulliam
200 River Market Ave., #200
Little Rock, AR 72201-1769

Evgueni Roudachevski
c/o Williams & Anderson
111 Center St., #2200
Little Rock, AR 72201

Excel National Bank
9701 Wilshire Blvd.
Suite 101
Beverly Hills, CA 90212

Fifth Third Bank
P.O. Box 9013
Addison, TX 75001

Fifth Third Bank
P.O. Box 740789
Cincinnati, OH 45274

Fifth Third Bank
Bankruptcy Department
1830 E. Paris Ave.
Grand Rapids, MI 49546

GE Capital
P.O. Box 740441
Atlanta, GA 30374-0441

GE Capital Retail Bank
c/o Recovery Mgmt. Systems Corp
25 SE 2nd Ave., #1120
Miami, FL 33131-1605

GERB/Discount Tire
P.O. Box 981439
El Paso, TX 79998

GERB/Discount Tire
P.O. Box 981127
El Paso, TX 79998-1127

H.J. Dane
KSTT Place
1111 E. River Dr.
Davenport, IA 52803-5740

H. Raymond Terpstra, II
3600 First Ave. NE
Suite 101
Cedar Rapids, IA 52402

HSBC bank
Attn: HSBC Retail Services
P.O. Box 5264
Carol Stream, IL 60197

Iowa Dept. of Revenue
Attn:Bankruptcy Unit
P.O. Box 10471
Des Moines, IA 50306

James L. Snyder
Federal Bldg, Rm 793
210 Walnut St.
Des Moines, IA 50309

James W. Radig
425 Second St. SE
Suite 900
Cedar Rapids, IA 52401

Jerry L. and Sharon K. Rhoads
1919 Wildwood Lane
Muscatine, IA 52761-2656

Karen Smith
c/o Reddick Moss
One Information Way, #201
Little Rock, AR 72202

Karen Smith/Est JoAnn Thompson
Reddick Moss, PLLC
One Information Way, Suite 105
Little Rock, AR 72202

Kathryn A. Stocks
Jones, Jackson & Moll, PLC
P.O. Box 2023
Fort Smith, AR 72902-2023

Kip Rhoads
6 Hickory Rd.
Cary, IL 60013-1106

Levada S. McGee
c/o Brian D. Reddick
Reddick Moss, PLLC
One Information Way, #201
Little Rock, AR 72202

Mark D. Walz
4201 Westown Pkwy.
Suite 300
West Des Moines, IA 50266

Mary Moses
c/o Eric D. Wewers
415 N. McKinley St., #1000
Little Rock, AR 72205

Michael Griffin
c/o Deborah T. Riordan
Wilkes & McHugh, PA
One Information Way, #300
Little Rock, AR 72202

Michael Griffin
c/o Deborah T. Riordan
212 Center St., #700
Little Rock, AR 72201-2450

Michael J. Whaley
1500 Omaha Tower
2120 s. 72nd St.
Omaha, NE 68124-2342

PNC Bank
2730 Liberty Ave.
Pittsburgh, PA 15222

PNC Bank
P.O. Box 94982
Cleveland, OH 44101

RCI North American Office
9998 N. Michigan Rd.
Carmel, IN 46032

Seterus Inc as the authorized
Subservicer for Fe
P.O. Box 2008
Grand Rapids, MI 49501-2008

Silver Pointe Realty
c/o Jones, Jackson & Moll
401 N. 7th St.
P.O. 2023
Fort Smith, AR 72902

Silver Pointe of Little Rock, LLC
Attn: Richard B. Griffin II
P.O. Box 2207
Fort Smith, AR 72902-2207

United States Trustee
Federal Bldg., Room 793
210 Walnut St.
Des Moines, IA 50309-2115

## UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| In Re: Jerry L. Rhoads & Sharon K. Rhoads, | ) ) ) ) ) | **Chapter 11**<br>**No. 14-00215-als11**<br>**Hon. Anita L. Shodeen** |
| Debtors. | ) | |

### DEBTORS' SECOND MODIFIED FIRST AMENDED PROPOSED COMBINED LIQUIDATING PLAN OF REORGANIZATION AND DISCLOSURE STATEMENT DATED JULY 11, 2014[1]

### I. INTRODUCTION AND GENERAL PLAN SUMMARY

The Debtors, Jerry L. Rhoads ("Jerry") and his wife, Sharon K. Rhoads ("Sharon"), are submitting this combined Modified First Amended Plan of Reorganization and Disclosure Statement (the "Plan") to their Creditors for their acceptance or rejection. The Debtors operate and are the majority owners of two nursing homes operating in Washington Iowa and Muscatine Iowa (the "Nursing Homes"). In general, the Debtors' Plan provides that (a) Claims of those of the Debtors' Creditors asserting Guaranty Claims against the Debtors arising out of the Debtors' guarantees of the Claims that those Creditors hold against the Nursing Homes will be paid by the Nursing Homes, (b) the Claim that one of the Nursing Homes holds against the Debtors will be subordinated to the Claims of the rest of the Debtors' Creditors, and (b) all of the Debtors' non-exempt assets will be liquidated and the proceeds thereof will be remitted to the Debtors' other Creditors in satisfaction of their Claims. The Debtors' Plan will be funded from (a) the Debtors' cash and deposit on hand and 2013 tax refunds, (b) the salaries the Debtors expect to be paid pursuant to their employment with the Nursing Homes, and (c) the proceeds the Debtors realize from the sale of (i) the Debtors former home in Illinois (the "Illinois Home") and (ii) the Nursing Homes or their interests therein.

**THE DEBTORS BELIEVE THAT ALL OF THEIR CREDITORS WILL BE PAID IN FULL, EITHER UNDER THIS PLAN OR BY THE NURSING HOMES.**

---

[1]      As used in the Plan and except as otherwise expressly defined herein, the capitalized terms set forth herein will have the respective meanings specified in **Exhibit 1** hereto.



## II. Summary of Classification of Claims & Distributions under the Plan

The Plan provides for the following classification and treatment of Claims:

| Creditors & Estimated Claim Amounts | Proposed Treatment Under Plan |
|---|---|
| **Class 1 Admin. Expenses** $60,000 | To be paid in full on the Effective Date. |
| **Class 2 Tax Claims** $0 | To be paid from the Plan Disbursement Account after the allowed Class 1 Administrative Claims have been paid in full. |
| **Class 3 Affiliate Guaranty Claims** $5,885,000 | To be paid by the Nursing Homes. The Debtors will remain liable for the unpaid portion of such Affiliate Guaranty Claims, notwithstanding the confirmation of this Plan. |
| **Class 4 Illinois Home Secured Claim** $277,518 | The Debtors will resume making monthly mortgage payments to the Class 4 holder of the first mortgage on the Illinois Home and, after repairing the Water Damage done to the Illinois Home, will (a) list it for sale and, (b) in the event that the Illinois Home is not sold within one year of the Effective Date, conduct an auction sale of the Illinois Home, with the net proceeds of such sale being remitted to the holder of the Class 4 Claim. |
| **Class 5 Illinois Home Unsecured Claim** $175,777 | The junior mortgage that Fifth Third Bank ("FTB"), the holder of the Class 5 Claim, holds on the Illinois Home will be deemed to be removed from the property, and its Claim will be included as a Class 9 Unsecured Creditor, unless FTB elects to reduce the amount of its claim to $75,000 and retain its junior mortgage upon the Illinois Home, which claim will be paid after the Debtors repair the Water Damage to the Illinois Home and the home is sold by the Debtors. |
| **Class 6 Iowa Home Secured Claim** $238,207 | The Debtors will continue to pay the Class 6 Iowa Home Secured Claim pursuant to the terms of the Iowa Home Mortgage until the Class 6 Iowa Home Secured Claim is paid in full. |
| **Class 7  Automobile Secured Claim** $14,516 | The Debtors will continue to pay the Class 7 Automobile Secured Claim pursuant to the terms of the Debtors' purchase agreement with regard thereto until the Class 7 Automobile Secured Claim is paid in full. |
| **Class 8 Caregiver Mgmt. Claim** $376,833 | The Class 8 Claim will be subordinated to the Claims of all of the Debtors' other Creditors, and no payment will be paid on the Class 8 Claim until all of said other Claims have been paid in full, at which time the Class 8 Claim will be paid as agreed upon by the Debtors and Caregiver Mgmt. |
| **Class 9 General Unsecured Claims** $682,096 | Commencing upon the first day of the third calendar month following the date that the Class 1 and 2 Claims have been paid in full, the holders of Class 9 Claims will receive their pro-rata share of quarterly payment in the amount of $15,000 (the "Quarterly Unsecured Plan Payments"). The Quarterly Unsecured Plan Payments will continue until the earlier of (a) 5 years or (b) all Class 9 Creditors are paid in full. The holders of the Class 9 Claims will also receive a pro-rata share of the net proceeds of the liquidation of the Debtors' interests in the Illinois Home and the Nursing Homes. |

## III. DISCLOSURES

A.   **Principal Factors Leading to the Chapter 11 Bankruptcy Filing:**

1.   **Problems with the Iowa Nursing Homes**. The Debtors' two Iowa Nursing Homes experienced severe cash flow difficulties due to (a) the settlement of certain claims asserted against them by the Iowa Department of Inspections and Appeals, (b) the cost of litigation, (c) the imposition of regulatory holds on admissions that precluded one of the Iowa Nursing Homes from admitting new patients for 8 months, which resulted in the reduction in its occupancy rate from 60% to 40% and a corresponding loss of $1.4 million in revenue, and (d) the payment of $100,000 in legal fees for appealing the regulatory allegations.   As a result of these problems, in December of 2013 each of the Nursing Homes commenced Chapter 11 Bankruptcy Cases (the "Nursing Home Chapter 11 Cases").   However, each of the Nursing Homes has received a substantial increase in the rates they are being paid by Medicare for patients residing in the Nursing Homes (the "Rate Increases").   These Rate Increases were retroactive to July 1, 2013, resulting in the two Nursing Homes receiving retroactive payments in the aggregate amount of $920,000 (the "Retroactive Payments").   As a result of these Rate Increases and Retroactive Payments, the Nursing Homes no longer need bankruptcy court protection and on June 13, 2014 the Nursing Home Chapter 11 Cases were both dismissed.

2.   **Arkansas Nursing Home Losses**.   Prior to the commencement of their Chapter 11 Case and in addition to the two Nursing Homes that the Debtors are currently operating, the Debtors owned and operated a third distressed nursing home located in Little Rock, Arkansas (the "Arkansas Nursing Home").   At the time that the Debtors acquired the Arkansas Nursing Home, the Debtors believed that they could successfully turn around the affairs of the Arkansas Nursing Home and operate it profitably.   Unfortunately, the problems with the Arkansas Nursing Home proved to be too much for the Debtors to handle, and the Arkansas Nursing Home was surrendered to its prior owner, to whom the Debtors ultimately agreed to pay $500,000 due to their failure to fulfill the terms of the Arkansas Nursing Home purchase agreement.   The Debtors were also named personally in five

wrongful death suits relating to death that took place at the Arkansas Nursing Home.

    **3.**    **Illinois Home Losses.**  Due to the deterioration of the finances of the Debtors' two Iowa Nursing Homes, the Debtors moved out of their Illinois Home and relocated to their current Iowa Home.  However, due to the decline in the real estate market, the value of the Debtors' Illinois Home had declined to below the amounts that the Debtors owed on the first and second mortgages upon the Illinois Home.  The Debtors had rented out the Illinois Home, but their renters moved out of the home without informing the Debtors.  While the Illinois Home was vacant a problem arose at the home resulting in the loss of heat to the home, which, in turn, resulted in certain of the pipes in the home bursting causing substantial damage to the Illinois Home.  The Debtors' insurance carrier has not accepted responsibility for repairing the Water Damage to the Illinois Home.  The Debtors believe that the current value of the Illinois Home is only equal to the amount owed to Seterus, Inc. ("Seterus"), which holds a first mortgage on the Illinois Home and that the current claim of FTB, which holds a junior mortgage on the Illinois Home, is in fact, unsecured.

**B.**    **Summary of Assets and Liabilities:**  The following is a summary of the Debtors' assets and liabilities as of February 7, 2014, the date the Debtors' commenced there Chapter 11 Case, (the "Petition Date") according to the Debtors' books, records and their filed bankruptcy schedules.  This summary does not take into consideration all of the proofs of claim filed herein or claims for lease or contract rejection damages.  The asset values contained herein and/or in the Debtors' schedules are based on the Debtors' best estimates of market values, and may not, and in all likelihood do not, accurately reflect liquidation values or what may ultimately be achieved for these assets.

1.    **Debtors' Assets:**

| Asset | Value | Liens | Net Value |
|---|---|---|---|
| Single Family Home: Hawthorn Woods, IL | 277,500[2] | (277,518) | 0 |
| Single Family Home: Muscatine, IA | 366,000 | (238,000) | 128,000 |
| Estimated Federal Income Tax refund | 30,000 | | 30,000 |
| Estimated State Income Tax refund | 10,000 | | 10,000 |
| 66.66% Caregiver Mgmt. Systems, Inc. | Unknown | | Unknown |
| 66.66 % All American Restorative Care of Washington, Inc. | Unknown | | Unknown |
| 66.66% of Rhoads Health Care Group, Inc. | 0 | | 0 |
| 100% of Caregiver Properties, LLC | 0 | | 0 |
| 66.66% stock of All American Care Centers, Inc. | 0 | | 0 |
| Life insurance policy minimal cash surrender value | 0 | | 0 |
| Potential Claims against the IDIA | Unknown | | Unknown |
| Insurance Claim regarding Hawthorn Woods property | Unknown | | Unknown |
| Household effects, clothing & misc. personal property | 36,272 | | 36,272 |
| 2006 Chrysler 300 SRT automobile | 13,939 | | 13,939 |
| 2008 Mazda automobile | 10,622 | (14,516) | 0 |
| Equity interest in Timeshare, Cabo/Mexico | 35,000 | | 35,000 |
| Total | 779,333 | (530,034) | 253,211 |

2.    **Disclosures with regard to the Debtors' Assets:**

a.    **Exemption Claims**.  As set forth in detail on Schedule C included in the
Schedules that the Debtors have filed with the Court, a summary of which is attached hereto as
**Exhibit 2**, the Debtors have claimed exemptions in the Iowa Home and certain of their other assets.

b.    **Corporate Interests**.  The Debtors valued their 66.66% interest in the
Nursing Homes as "Unknown" because these Nursing Homes were recently debtors in Nursing
Home Chapter 11 Cases, and the new Rate Increases discussed above just went into effect.  The
Debtors believe that, because of the Rate Increases and, provided the Debtors continue to manage
the Nursing Homes, the Nursing Homes will, in time as the Nursing Homes occupancy rates increase,
have significant value and can then be sold for sufficient amounts to enable all of their respective
Creditors to be paid in full and to generate sufficient dividends to the Debtors to enable them to pay

---

2       Debtors' estimated current value of the Illinois Home before the Water Damage has been repaired.

Rhoads Second Modified First Amended 9 2 14

all of their creditors in full.  The Debtors have had preliminary discussions with the brokerage firm of Marcus & Millichap, a brokerage firm with expertise in marketing nursing homes, for its preliminary opinion as to how to go about marketing the Nursing Homes.   Nonetheless, the Debtors believe that marketing the Nursing Homes is expected to take a number of years and that, if the Nursing Homes were immediately sold, it is unlikely that they could be sold for a sufficient amount to generate a significant dividend to the Debtors and, as such, for the time being the Debtors intend to concentrate on increasing the Nursing Homes' occupancy rates and otherwise stabilizing their operations before listing them for sale in order to increase their value.  Rhoads Health Care Group, Inc. and All American Care Centers, Inc. are insolvent assetless corporate entities and, as such, the Debtors' interest in these entities has no value.  Caregiver Properties, LLC holds title to the Debtors' Iowa Home, the value of which was listed separately from the value of the Debtors' ownership of the Caregiver Properties, LLC membership interest.

   3.    **Debtors' Liabilities[3]:**

| Illinois Home Secured Claims | | |
|---|---|---|
| Seterus, Inc. | 277,518[4] | Sr. Mtge. on Illinois Home |
| **Total Illinois Secured Claims** | **277,518** | |
| | | |
| Illinois Home Unsecured Claims[5] | | |
| FTB | 175,777 | Jr. Mtge. on Illinois Home |
| **Total Illinois Unsecured Claims** | **175,777** | |
| | | |

---

3    If a Creditor has filed a proof of claim, the amount of said Creditor's Claim is the amount of the Claim so filed.

4    This is the Debtors' belief as to the current value of the Illinois Home in light of the unrepaired Water Damage.

5    The Debtors believe that the FTB is unsecured because they believe that the current value of the Illinois Home is less than the amount owed to the holder of the first mortgage on the home.

Rhoads Second Modified First Amended 9 2 14

| | | |
|---|---|---|
| **Iowa Home Secured Claim** | | |
| Community Bank of Muscatine | 238,000 | Mtge. on Iowa Home |
| **Total Muscatine Home Secured Claim** | **238,000** | |
| | | |
| **Automobile Secured Claim** | | |
| PNC Bank | 14,516 | Lien upon 2008 Mazda automobile |
| **Total Automobile Secured Claim** | **14,516** | |
| | | |
| **Affiliate Guaranty Claims** | | |
| Community Bank of Muscatine | 3,643,558 | Pers. Guaranty of Nursing Home Debt |
| Chase | 8,000 | Pers. Guaranty of All American Debt |
| Excel National Bank | 1,200,000 | Pers. Guaranty of All American Debt |
| FTB | 56,627 | Pers. Guaranty of All American Debt |
| Iowa Department of Revenue | $22,080 | Pers. Liability for taxes of All-American Restorative Care of Washington, Inc. |
| Iowa Department of Revenue | $27,600 | Pers. Liability for taxes of Caregiver Management Systems Inc. |
| **Total Affiliate Guaranty Claims** | **4,955,365** | |
| | | |
| **Affiliate's Claim** | | |
| Caregiver Mgmt. | 376,833 | Loans |
| **Total Affiliate's Claims** | **376,833** | |
| | | |
| **Disputed Claims** | | |
| Cach LIC/Square Two Financial | 48,612 | Disputed Claim for corporate liability |
| Evgueni Roudachevski | 30,000 | Disputed Claim for corporate liability |
| Billy and Diann Simmons | Unknown | Disputed wrongful death Claim |
| Karen Smith - Estate of JoAnn Thompson | 1,000,000 | Disputed wrongful death Claim |
| Leveda S. McGhee | Unknown | Disputed wrongful death Claim |
| Mary Moses | Unknown | Disputed wrongful death Claim |
| Michael Griffin | Unknown | Disputed wrongful death Claim |
| **Total Disputed Claims** | **1,078,612** | |

| General Unsecured Claims | | |
|---|---|---|
| American Express | 1,106 | Credit Card Claim |
| Bank of America | 5,000 | Credit Card Claim |
| Bank of America | 6,279 | Credit Card Claim |
| Barclays Bank Delaware | 10,979 | Credit Card Claim |
| Barclays Bank Delaware | 4,141 | Credit Card Claim |
| Barclays Bank Delaware | 4,104 | Credit Card Claim |
| Capital 1 Bank | 3,456 | Credit Card Claim |
| Cach LLC / Square Two Financial | 48,612 | Line of Credit |
| Citibank SD, Na | 12,435 | Credit Card Claim |
| Citibank SD, Na | 11,657 | Credit Card Claim |
| Citibank SD, Na | 9,018 | Credit Card Claim |
| Community Bank/J Crew | 139 | Credit Card Claim |
| GE Capital | 2,000 | Credit Card Claim |
| GERB/Discount Tire | 555 | Credit Card Claim |
| HSBC Bank | 1,525 | Credit Card Claim |
| RCI North American Office | 10,000 | Credit Card Claim |
| RCI North American Office | 8,979 | Credit Card Claim |
| Silver Pointe Realty | 499,143 | Settlement Judgment Amount |
| **Total General Unsecured Claims** | **$682,096** | |

4.    **Disclosures with regard to the Debtors' Liabilities**:

a.    **Illinois Home Secured Claim.**  The Illinois Home Secured Claim is the claim that Seterus holds against the Debtors, which is secured by the first mortgage it holds upon the Debtors' Illinois Home.

b.    **Illinois Home Unsecured Claim.**  The Illinois Home Unsecured Claim is the claim that FTB holds against the Debtors, which is ostensibly secured by a second mortgage on the Illinois Home.  However, the Illinois Home is not currently worth more than the amount owed to Seterus, which holds the first mortgage on the Illinois Home, and, as such, the FTB claim is unsecured.

c.    **Iowa Home Secured Claim.**  The Iowa Home Secured Claim is the claim that Community Bank holds against the Debtors, which is secured by a mortgage that it holds upon the Debtors' Iowa Home.

  **d.**  **Automobile Secured Claim.**  The Automobile Secured Claim is the claim

that PNC Bank holds against the Debtors, which is secured by a lien that it holds upon the Debtors'

2008 Mazda automobile.

  **e.**  **Affiliate Guaranty Claims.**  The Affiliate Guaranty Claims are Claims

arising from the Debtors' personal guarantees of certain liabilities of the Nursing Homes.

  **f.**  **Affiliate's Claim.**  The Affiliate Claim of Caregiver Mgmt. is the balance

due on a loan Caregiver Mgmt. made to the Debtors in the amount of $425,833, less payments in the

amounts of $13,000, $8,000 and $28,000 that the Debtors paid to JP Mogan Chase, FTB and

Community Bank on behalf of Caregiver Mgmt. resulting in a net loan payable to Caregiver Mgmt.

in the amount of $376,833.

  **g.**  **Disputed Claims.**  The Disputed Claims are (i) Claims that have been

improperly asserted against the Debtors relating to indebtedness of one or more of the Debtors'

corporate entities and not the Debtors, or (ii) Claims with regard to which the Debtors otherwise

object.

  Included among the Disputed Claims with regard to which the Debtors intend to file

an objection is a claim filed by "Karen Smith/Estate of JoAnn Thompson" in the amount of $1 million

arising from the alleged wrongful death of JoAnn Thompson while Ms. Thompson was a patient of

the Arkansas Nursing Home. The Debtors were named in four wrongful death suits in Arkansas, but

the Thompson claim is the only claim filed in the Debtors' bankruptcy case. The Debtors dispute

this claim because they believe that under controlling Arkansas law they are not personally liable for

the alleged wrongful death of Ms. Thompson because (a) the Arkansas Nursing Home, where the

alleged actions took place resulting in Ms. Thompson's death, was owned and operated by All

American Care Centers, Inc. and not the Debtors personally, and (b) the Debtors did not personally

take any actions resulting in Ms. Thompson's death.

h.     **General Unsecured Claims**.   The General Unsecured Claims are the remaining unsecured Claims held against the Debtors.

## IV. PLAN PROVISIONS

A.     **Designation of Classes of Claims and Interests**.  For the purpose of the Plan, the Claims are hereby classified as follows:

1.     **Class 1 [Administrative Expense Claims]**: Allowed Administrative Expense Claims entitled to priority pursuant to the provisions of Section 503 (b) of the Code, and the United States Trustee fees.

2.     **Class 2 [Tax Claims]**:  Allowed Tax Claims held by taxing agencies entitled to priority pursuant to the provisions of Section 507(a) (8) of the Code.

3.     **Class 3 [Affiliate Guaranty Claims]**:  The Allowed Claims that (a) Community Bank of Muscatine ("Community Bank"), (b) Excel National Bank ("Excel" and collectively with Community Bank the "Guaranty Creditors") hold against the Debtors based upon the Debtors' personal guaranty of the indebtedness owed to the Guaranty Creditors by the Nursing Homes (the "Guaranty Indebtedness").

4.     **Class 4 [Illinois Home Secured Claim]**:  The Allowed Secured Claim of Seterus, which holds a first mortgage upon the Debtors' Illinois Home, which was damaged due to the pipes in the home freezing (the "Water Damage").  The Debtors' have filed a Claim with Foremost Insurance Company (the "Insurance Company"), in which the Debtors are seeking to have the Insurance Company pay to repair the Water Damage to the Illinois Home (the "Insurance Claim").

5.     **Class 5 [Illinois Home Unsecured Claim]**:  The Allowed Unsecured Claim of FTB, which is ostensibly secured by a second mortgage on the Illinois Home.  However, the Illinois Home is not worth more than the amount owed to Seterus, which holds the first mortgage on the Illinois Home, and, as such, the FTB claim is unsecured.

Rhoads Second Modified First Amended 9 2 14

6.      **Class 6 [Iowa Home Secured Claim]**: The Allowed Secured Claim of Community Bank, which holds a mortgage (the "Iowa Home Mortgage") upon the Debtors' Iowa Home, the title to which is held in the name of Caregiver Properties, LLC ("Caregiver Properties").

7.      **Class 7 [Automobile Secured Claim]**: The Allowed Secured Claim of PNC Bank, which holds a lien upon the Debtors' 2008 Mazda automobile.

8.      **Class 8 [Caregiver Mgmt. Claim]**: Allowed Claim of Caregiver Mgmt. in the amount of $376,833.

9.      **Class 9 [General Unsecured Claims]**: Allowed Claims against the Debtors that arose or that are deemed by the Code to have arisen prior to the Petition Date, and which are not (a) Secured Claims pursuant to Section 506 of the Code, or (b) Claims entitled to priority under Sections 503 or 507 of the Code; and Claims arising from the Debtors' rejection of executory contracts and leases.

**B.      Treatment of Claims.**

1.      **Treatment of Class 1 [Administrative Expense Claims]**: Allowed Administrative Expense Claims shall be paid in cash on the Effective Date except to the extent that the holder of such a Claim agrees otherwise, or in the case of any Administrative Expense Claim that requires Bankruptcy Court approval, upon the entry of an order by the Bankruptcy Court in these proceedings approving same. Class 1 Claims are not impaired unless the Class 1 Creditors agree to be impaired.

2.      **Treatment of  Class 2 [Tax Claims]**: In full and complete satisfaction of all Class 2 Claims, after the allowed Class 1 Administrative Claims have been paid in full, the Class 2 Creditors will be paid from the Plan Disbursement Account described in paragraph IV D 6 below, as funds become available therein until the allowed amount of their Class 2 Claims (including interest that will continue to accrue on the allowed Class 2 Claims at the applicable statutory rate for such Tax Claims) has been paid in full. The Debtors believe there are no Class 2 Claims. The Class 2 Claims are not impaired.

Notwithstanding any other provision in the Plan or in the order confirming the Plan, any unpaid Iowa tax liabilities (including penalties and interest) that would be non-dischargeable pursuant to the provisions of 11 U.S.C. § 523, shall also be excepted from discharge under the confirmed Plan.

3.        **Treatment of Class 3 [Affiliate Guaranty Claims]**: The Guaranty Creditors will be paid in full by the Nursing Homes. As such, the Guaranty Creditors will receive no distribution under the Debtors' Plan. If the Affiliate Guaranty Claims are not paid in full by the Nursing Homes, the Debtors will remain liable for the unpaid portion of such Affiliate Guaranty Claims, notwithstanding the confirmation of this Plan. The Class 3 Claims are impaired.

4.        **Treatment of Class 4 [Illinois Home Secured Claim]**: Upon the Effective Date the Debtors will (a) make the repairs necessary to the Illinois Home to repair the water damage, the cost of which is expected to be approximately $25,000 and said repairs will be completed within 45 days of the Effective Date, (b) resume making monthly mortgage payments to the Class 4 Creditor, and (c) after the Water Damage has been repaired, list the Illinois Home for sale with an Illinois broker at a listing price and upon the conditions described further in Section IV D 2 below. If the Illinois Home has not been sold after 12 months, it will be listed with an auctioneer who will conduct an auction sale of the property no later than 14 months after the Effective Date. The net proceeds from the sale of the Illinois Home, after brokerage fees, closing costs and mortgages on the property have been paid in full will be used to fund the Plan. The Class 4 Claim is impaired.

Notwithstanding the foregoing, the Debtors will not be required to sell the Illinois Home if (a) they have cured all arrearages under the first mortgage on the Illinois Home held by the Class 4 Creditor and (b) the Debtors have made all of the payments otherwise called for under the Plan.

In the event that within 14 months from the Effective Date (a) the Illinois Home is not sold for an amount sufficient to fully satisfy the Illinois Home Secured Claim and (b) the Debtors have

Rhoads Second Modified First Amended 9 2 14

not cured all arrearages under the first mortgage on the Illinois Home held by the Class 4

Creditor, the automatic stay imposed pursuant to 11 U.S. C. 362 will lift without further order of the

Court to enable the Class 4 and Class 5 Creditors to pursue their state court foreclosure remedies

with regard to their mortgages on the Illinois Home.

5.    **Treatment of  Class 5 [Illinois Home Unsecured Claims]**:    Upon the Effective

Date, FTB's Claim will be classified with and treated as a Class 9 Unsecured Creditor, and it will

receive a pro-rata distribution on its claim as though it was a Class 9 Creditor.  FTB will retain its

lien on the Illinois Home.  Upon the Sale of the Illinois Home, FTB will receive its portion of the net

proceeds of the sale of the property, after the Class 4 Claim and all closing costs have been paid in

full.  The Class 5 Claim is impaired.

6.    **Treatment of Class 6 [Iowa Home Secured Claim]**:  The Debtors will continue to

pay the Class 6 Iowa Home Secured Claim pursuant to the terms of the Iowa Home Mortgage until

the Class 6 Iowa Home Secured Claim is paid in full.  The Class 6 Claim is not impaired.

7.    **Treatment of Class 7 [Automobile Secured Claim]**:  The Debtors will continue to

pay the Class 7 Automobile Secured Claim pursuant to the terms of the Debtors' purchase agreement

with regard thereto until the Class 7 Automobile Secured Claim is paid in full.  The Class 6 Claim is

not impaired.

8.    **Treatment of  Class 8 [Caregiver Mgmt. Claim]**:  The Allowed Class 8 Claim of

Caregiver Mgmt. will be subordinated to the Claims of all of the Debtors' other Creditors, and no

payment will be paid on the Class 8 Claim until all of said other Claims have been paid in full, at

which time the Class 8 Claim will be paid as agreed upon by the Debtors and Caregiver Mgmt. The

Class 8 Claim is impaired.

9.    **Treatment of Class 9 [General Unsecured Claims]**:    Commencing upon the first

day of the third calendar month following the date that the Class 1 and 2 Claims have been paid in

full, the holders of Class 9 Claims will receive their pro-rata share of quarterly payments in the

Rhoads Second Modified First Amended 9 2 14

amount of $15,000 (the "Quarterly Unsecured Plan Payments"). The Quarterly Unsecured Plan Payments will continue until the earlier of (a) 5 years after the Effective Date, or (b) all Class 9 Creditors being paid in full. The holders of the Class 9 Claims will also receive a pro-rata share of the net proceeds of the liquidation of the Debtors' interests in the Illinois Home and the Nursing Homes. The Class 9 Claims are impaired.

C.    **Unclaimed Distributions**. Any unclaimed payment made to any Creditor, including without limitation, un-negotiated checks or drafts, shall be redistributed to other Creditors in the order described in Section IV D7 below after one hundred eighty (180) days of issuance as if the amount due the Creditor, which is unclaimed, constituted a Claim that was disallowed.

D.    **Means for Execution of the Plan.** The Plan shall be executed as follows:

1.    **Employment Contracts.** Upon the Effective Date the Debtors will enter into employment contracts with each of the Nursing Homes, each of which will provide as follows: (a) Term: six years; (b) Annual salaries: Jerry $66,000, Sharon $39,000; and Housing subsidy: Jerry will receive $1,250 monthly.

2.    **Sale of Illinois Home**. Upon the Effective Date Debtors will repair property at their cost, thereby increasing the value of the property above the amount owed to Seterus. Said repairs will be completed within 45 days of the Effective Date, The Debtors will resume making monthly mortgage payments to Seterus, which when added to the enhanced value of the Illinois Home after it has been repaired will result in the Seterus claim being "adequately protected."

The Illinois Home will be listed for sale with a broker at an initial agreed asking price of $450,000. Until the Illinois Home is under contract for sale, the Debtors will reduce the listing price for the property by $10,000 every 45 days until the earlier of (a) the property being sold, or (b) 12 months after the Plan Effective Date. The Debtors will have the right to make additional reductions in the asking price for the property, provided that they will not reduce the asking price of the property

below the aggregate amount owed to Seterus and FTB (if FTB exercises its option to retain its Reduced FTB Jr. Mtg.) without the written consent of Seterus and FTB.

If the Illinois Home has not been sold by the first anniversary of the Effective Date, the Illinois Home will be placed with an auctioneer who will thereafter conduct an auction of the property (to be conducted no later than 60 days thereafter), at which Seterus and FTB (if FTB exercises its option to retain its Reduced FTB Jr. Mtg.) will respectively be allowed to credit bid the amount of their mortgage claims.

The net proceeds of the sale of the Illinois Home, either through a broker's sale or auction, will be first remitted to Seterus and then FTB (if FTB exercises its option to retain its Reduced FTB Jr. Mtg.) until their claims are paid in full, and the balance, if any, will be remitted to the Debtors, who will make a pro-rata distribution of such surplus proceeds to the Debtors' Class 9 Creditors.

Notwithstanding the foregoing, the Debtors will not be required to sell the Illinois Home if (i) they have cured all arrearages under the first mortgage on the Illinois Home held by the Class 4 Creditor and (ii) the Debtors have made all of the payments otherwise called for under the Plan.

In the event that within 14 months from the Effective Date (i) the Illinois Home is not sold for an amount sufficient to fully satisfy the Illinois Home Secured Claim and (ii) the Debtors have not cured all arrearages under the first mortgage on the Illinois Home held by the Class 4 Creditor, the automatic stay imposed pursuant to 11 U.S.C. 362 will lift without further order of the Court to enable the Class 4 and Class 5 Creditors to pursue their state court foreclosure remedies with regard to their mortgages on the Illinois Home.

3. **Sale of Nursing Homes or the Debtors' Interests Therein**. The Debtors will actively market the Nursing Homes or their shares in the Nursing Homes, in connection with which the Debtors believe, but cannot guaranty, that they will realize sufficient proceeds to satisfy all of

the Claims of their Creditors.   If the Nursing Homes or the Debtors' interests therein have not been sold by the fourth anniversary of the Effective Date, the Nursing Homes or the Debtors' interests will be placed with an auctioneer who will thereafter conduct an auction of the Nursing Homes or the Debtors' interests (to be conducted no later than 180 days thereafter), at which the holders of the liens upon the Nursing Homes and/or the Debtors' interests therein will be allowed to credit bid the amount of their Allowed Secured Claims.   Upon the sale of the Nursing Homes or the Debtors' interest therein, the Debtors will use the net proceeds they receive from such sale to pay the balance of the payments called for under their Plan.

The Nursing Homes have recently entered into a letter of intent (the "LoI"), pursuant to the terms of which the Nursing Homes' assets will be sold (the "NH Asset Sale") for an aggregate purchase price of $8.5 million.  The proceeds of the sale of the NH Asset Sale will be (a) first used to fully pay off all of the indebtedness of the Nursing Homes, including the Affiliate Guaranty Claims, (b) then used to pay the taxes that will be incurred in connection with the NH Asset Sale, including those taxes which would become due and owing by the Debtors arising from the NH Asset Sale, and (c) finally be distributed to the Debtors and the other owners of the Nursing Homes.  While the exact amount of the net proceeds to be distributed to the Debtors from the NH Asset Sale has yet to be calculated, those proceeds are expected to be more than sufficient to fully fund all of the payments called for under the Plan.

**4**      <u>**Payment of Iowa Home Mortgage.**</u>   The monthly mortgage payments to be made on the Class 6 Iowa Secured Home Claim will be funded from the monthly housing subsidy that Jerry will receive under his Employment Contracts.

**5**      <u>**Payment of Automobile Secured Claim.**</u>  The Debtors will continue to pay the Class 7 Automobile Secured Claim pursuant to the terms of the Debtors' purchase agreement with regard thereto until the Class 7 Automobile Secured Claim is paid in full.

**6      Plan Funding Deposits.**  Upon the Effective Date, the Debtors will establish a new bank account (the "Plan Disbursement Account").   Commencing upon the Effective Date and continuing thereafter until all of the payments called for under the Plan have been made, the Debtors will make the following deposits (the "Plan Funding Deposits") into the Plan Disbursement Account, from which the remaining payments called for under the Plan (the "Plan Funding Payments") will be made: (a) the Debtors' cash and deposits on hand on the Effective Date in excess of $5,000 and 2013 state and federal tax refunds, estimated to total approximately $40,000, will be deposited into the Plan Disbursement Account when they are received by the Debtors; and   (b) the Debtors will make monthly deposits of $5,000 into the Plan Disbursement Account, which deposits will be funded from the salaries that the Debtors will be earning under their Employment Contracts.

As disclosed on the "Plan Projection" attached hereto as **Exhibit 3**, the allowed Class 2 Administrative Claims of approximately $60,000 and Class 9 Unsecured Claims total $637,143.  The Debtors believe that over the 60-month life of the Plan, the contributions that the Debtors make from their salaries along with the proceeds from the liquidation of the Debtors' assets pursuant to the Plan will be sufficient to fully pay all of the Debtors' Creditors within 60 months, with the exception of (a) the Class 3 Affiliate Guaranty Claims to be paid by the Nursing Homes, (b) the Class 8 Caregiver Claim which is to be subordinated, and (b) the mortgage payments to be paid to Community Bank as the holder of the Class 6 Claim under the Debtors' Plan, which be paid over the life of the mortgage on the Iowa Home.

**7.      Plan Disbursements.**  Commencing upon the Effective Date and continuing thereafter until all of the payments called for under the Plan have been made, the funds in the Plan Disbursement Account will be used to (a) first fully pay the Allowed Class 1 Administrative Claims, and (b) second fully pay the Allowed Class 2 Priority Tax Claims on a Pro-Rata basis.  Commencing upon the first day of the third calendar month following the date that the Class 1 and Class 2 Claims have been paid in full, the funds in the Plan Disbursement Account will be used to pay the Allowed

Class 9 General Unsecured Claims on a Pro-Rata basis until such Claims have been paid in full. The

net proceeds of the sale of the Illinois Home and the Nursing Homes will be deposited into the Plan

Disbursement Account and thereafter disbursed to the Allowed Class 9 General Unsecured Creditors

on a pro-rata basis on the first date of the month following the Debtors' receipt of such proceeds.

      **8.**      **Prosecution of Insurance Claim and Distribution of Insurance Proceeds**. The

Debtors reserve the right to prosecute the Insurance Claim and (a) use the Insurance Proceeds to

reimburse themselves for the cost to repair the Illinois Home, and (b) then to remit the Insurance

Proceeds first to Seterus and then to FTB (if FTB exercises its option to retain its Reduced FTB Jr.

Mtg.)   If litigation becomes necessary to recover on the Insurance Claim, the Debtors will, at their

discretion, either retain counsel to prosecute a law suit upon a contingent fee basis, or, tender the

prosecution of the law suit to Seterus and then to FTB.

      **9.**      **Abandonment of IDIA Potential Claims.** In their filed Bankruptcy Schedules, the

Debtors listed among their assets potential claims they held against the IDIA, the likelihood of

prevailing upon which the Debtors consider slim. The Debtors listed such claims in the interest of

full disclosure; however, the Debtors do not intend to pursue said claims because they believe the

likelihood of prevailing thereon is not great and, pursuing such claims would potentially harm the

future relationship between the Nursing Homes and the State of Iowa.

      **10.**      **Plan Disbursing Agent.** Jerry will serve as the Disbursing Agent, and Sharon will

serve as the successor Disbursing Agent for the Plan and will administer the Plan and the payments

called for in accordance with the provisions of the Plan. No compensation will be paid to the

Disbursing Agent or the Successor Disbursing Agent for performing the services called for under the

Plan.

      **E.**      **Modification of the Plan before Substantial Consummation**. The Reorganized Debtors

may modify this Plan at any time after the Confirmation of and before substantial consummation of

this Plan, but may not modify the Plan so that the Plan as modified fails to meet the requirements of

Sections 1122 and 1123 of the Code. The Plan as modified under this subsection becomes the Plan only if the Bankruptcy Court, after notice and a hearing, confirms such Plan as modified, under Section 1129 of the Code, and circumstances warrant such modification.

**F.**    **Non-Material Modification.**    The Reorganized Debtors may, with approval of the Bankruptcy Court, and so long as it does not materially and adversely affect the interest of any Creditors remedy any defect or omission, or reconcile any inconsistencies in the Plan or amend the Plan in such manner as it may be necessary to carry out the purposes and effect of the Plan, or sever a clause or provision of the Plan if necessary to satisfy Bankruptcy Code requirements.

**G.**    **Procedures for Resolving Contested Claims and Interests**

    **1.**    **Prosecution of Pending Objections to Claims**.    All timely filed objections to Claims shall continue to be prosecuted after the Effective Date.    Subject to Bankruptcy Court approval, the Reorganized Debtors shall have the discretion to litigate to judgment, settle or withdraw objections to contested Claims.

    **2.**    **Objections to Claims Waived if Not Timely Filed.**    Any objection to a Claim not timely filed by 60 days after the Effective Date is waived.

**H.**    **Discharge of Debtors.**    Pursuant to provisions of 11 U.S.C 1141(d), upon the completion of the payments under the Plan, the Debtors will be discharged from any debt that arose before the Petition Date and any debt of a kind specified in section 502(g), 502(h), or 502(i) of the Code.

**I.**    **Payment of US Trustee Fees.** Until the Debtors' Chapter 11 Case is closed, the Debtors will continue to pay all statutory fees due and owing to the office of the United States Trustee.

**J.**    **Retention of Jurisdiction.** The Bankruptcy Court shall retain and have jurisdiction over the Reorganized Debtors and the Plan for the following purposes:

    **1.**    To enable the Reorganized Debtors to consummate the Plan and to resolve any disputes arising with respect thereto;

2.      To enable the Reorganized Debtors to consummate any and all proceedings that were brought prior to the entry of the Confirmation Order;

3.      To set aside liens and encumbrances, and to recover any preferences, transfers, assets or damages to which the Reorganized Debtors or their Estate may be entitled under applicable provisions of the Code or other federal, state, or local law;

4.      To adjudicate all controversies concerning the classification or allowance of any Claims or Interests;

5.      To hear and determine all Claims arising from the rejection of any executory contracts or unexpired leases;

6.      To liquidate and/or defend against any Claims that are disputed, contingent, or unliquidated;

7.      To determine any and all objections to the allowance of Claims or Interests;

8.      To adjudicate all Claims to a security or ownership interest in any property of the Debtors or in any proceeds thereof;

9.      To adjudicate all Claims or controversies arising out of any purchases, sales or contracts made or undertaken by the Debtors during the pendency of these proceedings;

10.     To recover all assets and properties of the Debtors wherever located;

11.     To adjudicate and determine any cause of action provided for under the Plan, provided that any such action for the purpose of adjudication of the Code shall be commenced within two (2) years of the date of the filing of the Debtors' voluntary petition;

12.     To make such orders as are necessary or appropriate to carry out the provisions of the Plan;

13.     To consider any modifications of the Plan, remedy any defect or omission or reconcile any inconsistency in the Plan or in any order of the Bankruptcy Court, including the Confirmation Order;

Rhoads Second Modified First Amended 9 2 14

14.    To consider and act on the compromise and settlement of any Claim against or cause of action by or against the Reorganized Debtors or their estate;

15.    To adjudicate and determine any adversary proceeding permitted under the Code;

16.    To hear and determine all fee applications and fee disputes; and

17.    To confirm the sale of any of the Debtors' assets as called for under the Plan.

## V. PLAN PURPOSE AND ACCEPTANCE OR REJECTION OF PLAN

A.    **Purpose of Plan and Disclosures**.  This Plan, the Court Order allowing the Plan to be circulated, and a ballot for holders of impaired Claims to vote to accept or reject the Plan are being sent to all known actual or potential holders of Claims, irrespective of the validity of the underlying Claims. The receipt by a Creditor of the Plan does not mean that the recipient has a Claim or that the Claim has been allowed.   The purpose of this Plan and the disclosures set forth herein is to provide each Creditor with a description of the Plan and other information to aid it in making an informed decision as to whether to accept the Plan.

Creditors may vote on the Plan by filling out and mailing the accompanying ballot.  On August 21, 2014 at 9:00 a.m. a hearing to consider if this Plan contains adequate information to enable Creditors to make an informed decision about the proposed Plan will be held by the Court or by any other judge sitting in the Court's place, in the Bankruptcy Courtroom on the first floor of the United States Courthouse, 131 E. 4th Street, Davenport, Iowa.  If, at the conclusion of said hearing, the Court determines that this Plan contains adequate information, the Court will immediately hold a hearing to consider Confirmation of the Plan. That hearing may be continued from time to time with no additional notice except as given in open Court.  At the Confirmation Hearing, the Court will enter an order confirming the Plan if requisite acceptances of the Plan have been received and the full statutory requirements have been met.  The information contained in this Plan has been submitted by the Debtors unless specifically stated to be from other sources.

This Plan should be read carefully in order for Creditors to formulate an opinion as to the

Rhoads Second Modified First Amended 9 2 14

Plan's implications and effect on each Creditor's rights, and in order to formulate an opinion as to whether to accept or reject the Plan. The ability of the Debtors to consummate the Plan is based on certain assumptions regarding future events. Neither the Debtors nor their attorneys represent or warrant the accuracy of any financial projections or of any factual or legal representations contained herein or in the Plan. However, great effort has been made to be cautious and accurate with respect to financial projections and discussions of future events. The financial information contained in this Plan has not been subject to a certified audit.

**B.** **No Other Plan Information Authorized.** The Plan is the only information authorized by the Debtors or the Court to be distributed to Creditors. No representations concerning the Debtors are authorized other than as set forth herein. In deciding whether to accept the Plan, Creditors should not rely upon any representations or inducements made to secure their acceptance other than the representations contained in the Plan.

**C.** **Voting on the Plan.** Code section 1126 provides that at least two-thirds in amount and more than one-half in number of the allowed Claims against the Debtors voting in each Class of impaired Creditors must accept the Plan for the Plan to be confirmed by the Court. Only members of impaired Classes are entitled to vote on a plan. The impaired Classes are 3, 4, 8 & 9. A ballot is enclosed with the Court's order setting the hearing at which the Court will consider confirmation of the Plan and authorizing dissemination of the Plan to Creditors. Any Creditor holding an impaired Claim wishing to vote to accept or reject the Plan must complete, date, sign and return the ballot to one of the attorneys for the debtors-in-possession at their following addresses:

Chester H. Foster, Jr.
Attorney for Debtors in Possession
Foster Legal Services, PLCC
3825 W. 192nd St.
Homewood, IL 60430
(708) 799-6300
ARDC #03122632

H. J. DANE
Attorney for Debtors in Possession
IA#9999913/IL#6182600
KSTT Place, 1111 E. River Drive
Davenport, IA 52803
Phone: (563) 326-0006

The ballot must be received by one of the above attorneys by 5:00 p.m. on August 13, 2014. Any ballot received after that date and time will not be considered. No ballot, once received, can be changed or withdrawn without a hearing before the Court.

**D.    Confirmation Notwithstanding Lack of Acceptance**. In the event that the Plan is not accepted by at least two-thirds in amount and more than one-half in number of the Creditors of the Debtors in each impaired Class, the Debtors may request the Court to confirm the Plan pursuant to the "cram-down" provisions of code section 1129(b). In such case, the Court will confirm the Plan if the Court finds that at least one impaired Class of Claims has accepted the Plan, that the Plan is "fair and equitable" to the non-accepting Classes, and that certain other requirements for confirmation have been met. If the Court determines that the Plan does not comply with Section 1129(b) with respect to one or more Class or Classes, the Plan automatically will be amended to modify the treatment of that and any other Class or Classes, even if the effect of such amendment is to render such treatment less favorable, so as to provide the treatment necessary to correct any noncompliance with section 1129(b) found by the Court.

## VI. FEASIBILITY OF THE PLAN

The Plan is to be funded by (a) the Debtors' post-confirmation Disposable Monthly Income described on **Exhibit 5**, (b) the Debtors' cash and deposits on hand on the Effective Date in excess of $5,000 and Tax Refunds, (c) sale of the Illinois Home, and (d) sale of the Nursing Homes or the Debtors' interests therein, which, as set forth on the "Plan Projection" attached hereto as **Exhibit 3**, is projected by the Debtors to be adequate to fully fund the Plan.

## VII. LIQUIDATION ANALYSIS

As disclosed on the "Liquidation Analysis of the Debtors' Assets" attached hereto as Exhibit **4**, only $91,711 would be generated from the immediate liquidation of all of the Debtors' non-exempt assets. As such, Creditors will receive more under the Plan than in a Chapter 7 case.

Rhoads Second Modified First Amended 9 2 14

## VIII. ALTERNATIVES TO THE PROPOSED PLAN

An alternative to the current Plan would be conversion of the Debtors' Chapter 11 Case to a

Chapter 7 Case.  As discussed in Section VII above & disclosed in the "Liquidation Analysis of the

Debtors' Assets," In such an event Creditors would only receive a very small distribution on their

Claims, as opposed to the payment in full that the Debtors' believe that their Creditors will receive

under the Debtors' Plan.  Thus, the Debtors believe that the conversion of their Case to a Chapter 7

Case is not in the best interests of the Debtors, their estate or Creditors.

## IX. DEBTORS' RECOMMENDATION

**THE DEBTORS BELIEVE THAT IT IS IN THE BEST INTEREST OF THEIR
ESTATE AND THEIR CREDITORS FOR THE PROPOSED PLAN TO BE APPROVED
AND, AS SUCH, THE DEBTORS URGE THEIR CREDITORS TO CAST BALLOTS TO
ACCEPT THE PLAN.**

Dated: July 11, 2014

<div style="margin-left: 40%;">

Respectfully submitted,
Jerry L. and Sharon K. Rhoads

By:    */s/ Chester H. Foster, Jr.*
One of their attorneys

</div>

| | |
|---|---|
| Chester H. Foster, Jr., Attorney for Debtors | H. J. DANE, Attorney for Debtors |
| Foster Legal Services, PLCC | IA#9999913/IL#6182600 |
| 3825 W. 192nd St. | KSTT Place, 1111 E. River Drive |
| Homewood, IL 60430 | Davenport, IA 52803 |
| (708) 799-6300 | Phone: (563) 326-0006 |
| ARDC #03122632 | |

## Exhibit 1
## DEFINITIONS

As used in the Plan, the following terms shall have the respective meanings specified below:

**"Allowed Claim"** shall mean (a) any Claim for which a Proof of Claim has been filed with
the Bankruptcy Court on or before the date designated by the Bankruptcy Court as the last

date for filing Proofs of Claim or (b) any Claim which has been or hereafter is filed by the Debtors with the Bankruptcy Court, including any amendments thereto, and which is not listed as disputed, contingent, or unliquidated as to amount; and, in either case, a Claim as to which either no objection to the allowance thereof has been or shall be filed and the time to file such an objection has expired, or if any objection to the allowance thereof has been or shall be filed, such objection has been denied or the Claim fixed as to amount by an order or judgment that has become fixed by reason of the expiration of the period of appeal therefrom or from any decision on appeal without an appeal or further appeal having been taken.

**"Administrative Expense Claim"** shall mean any cost, Claim or expense of administration of the Chapter 11 Case allowed and entitled to priority in accordance with Sections 503(b) and 507(a)(1) of the Code and any such cost, Claim or expense accorded such status by agreement which has been approved by the Court, including, without limitation, any actual and necessary expenses of preserving the Debtors' estate, all allowances of compensation or reimbursement of expense for attorneys, accountants, actuaries, appraisers and other advisors to the extent allowed by the Court against the Debtors' estate under Sections 330, 331 and 503 of the Code including fees due the Unites States Trustee assessed against the Debtors' estate pursuant to 28 U.S.C. Section 123.

**"Avoidance Action"** shall mean any action commenced by the Debtors on behalf of the Debtors' estate, pursuant to Section 544-553 of the Code.

**"Bankruptcy Court"** shall mean the United States Bankruptcy Court for the Southern District of Iowa, including in context, the Judge hearing the case.

**"Claim"** shall have the meaning set forth in Section 101(4) of the Code and shall include Claims arising from rejection of executory contracts and unexpired leases.

**"Code"** shall mean Title 11, United States Bankruptcy Code, Section 101, et seq., as amended from time to time.

**"Confirmation Date"** shall mean the date that the Bankruptcy Court enters an order confirming the Plan.

**"Confirmation Order"** shall mean the order of the Bankruptcy Court confirming the Plan.

**"Creditor"** and **"Claimholder"** shall mean the holder of a Claim against the Debtor.

**"Debtors"** shall mean Jerry L. Rhoads and Sharon K. Rhoads, the Debtors in these Chapter 11 Proceedings.

**"Deficiency Claim"** shall mean the amounts determined to be due and owing to the Class 4 Secured Creditors after the Class 4 Secured Creditors shall have liquidated their collateral and applied the proceeds thereof against the Debtors' indebtedness to the Class 4 Secured Creditors.

**"Disbursing Agent"** shall mean the Debtor, Jerry L. Rhoads.

"**Disposable Monthly Income**" shall mean (a) the Debtors' monthly income, excluding their exempt social security benefits, less (b) their payroll deductions and other monthly average expenses as described on **Exhibit 5**.

"**Effective Date**" shall mean the first business day following the day on which the Confirmation Order becomes a Final Order, without any party in interest having appealed from same.

"**Final Order**" shall mean an order which has not been reversed, stayed, modified or amended and as to which the time to appeal or to seek review or rehearing has expired and as to which no appeal or petition for review or rehearing is pending.

"**General Unsecured Claims**" shall mean Claims that are neither Administrative Priority Claims nor Secured Claims as defined herein.

"**Guaranty Claims**" shall mean Claims asserted against the Debtors arising out of the Debtors' guaranty of the payment by third-party of such third party's indebtedness to a Creditor.

"**IDIA**" shall mean the State of Iowa Department of Inspections & Appeals.

"**Iowa Home**" shall mean the Debtors' Single Family Home located at 1919 Wildwood Lane, in Muscatine, IA 52761.

"**Nursing Homes**" shall mean All American Restorative Care of Washington, Inc., and Caregiver Management Systems, Inc.

"**Petition Date**" shall mean the date that the voluntary petition seeking relief under Chapter11 of the Code was filed by the Debtors, to wit: February 7, 2014.

"**Plan**" shall mean this First Amended Plan of Reorganization, all exhibits thereto and any amendments or modifications thereof.

"**Plan Payments**" shall mean the payments that the Debtors are to pay the Creditors under the Plan.

"**Proceedings**" shall mean this Chapter 11 Case now pending in the United States Bankruptcy Court for the Southern District of Iowa, and bearing the Case designation No. 14-00215.

"**Pro-Rata**" shall mean the proportion that the amount of a Claim in a particular class bears to the aggregate amount of all Claims of such class.

"**Rejection Claim**" shall mean any Claim arising by reason of the Debtors rejecting an executory contract or lease.

"**Reorganized Debtors**" shall mean the Debtors, Jerry L. Rhoads and Sharon K. Rhoads, after the entry of the Confirmation Order.

**"Secured Claim"** shall mean an Allowed Claim secured by a lien on property in which the Debtors have an interest.

**"Successor Disbursing Agent"** shall mean the Debtor, Sharon Rhoads.

**"Unsecured Claim"** shall mean any Claim against the Debtors that arose or that is deemed by the Code to have arisen prior to the Petition Date, and which is not (a) a Secured Claim pursuant to Section 506 of the Code, or (b) a Claim entitled to priority under Sections 503 or 507 of the Code.

## Exhibit 2
## Claimed Exemptions

| Description of Property | Specify Law Providing Each Exemption | Value of Claimed Exemption | Value Without Deducting Exemption |
|---|---|---|---|
| 1919 Wildwood Lane, Muscatine, IA 52761 Titled in Caregiver Management Systems Inc. | Iowa Code §§ 561.2, 561.16, 499A.18 | $366,000.00 | $366,000.0 |
| Husband's checking account at Community Bank | Iowa Code § 627.6(14) | $2,000.00 | $3,545.0 |
| Miscellaneous household goods & Furnishings | Iowa Code § 627.6(5) | $10,000.00 | $10,000.0 |
| Art objects. | Iowa Code § 627.6(5) | $2,500.00 | $2,500.0 |
| Husband's personal clothing. | Iowa Code § 627.6(5) | $500.00 | $500.0 |
| Wife's personal clothing. | Iowa Code § 627.6(5) | $500.00 | $500.0 |
| Fur Coat | Iowa Code § 627.6(5) | $3,000.00 | $3,000.0 |
| Wedding and engagement rings and other miscellaneous jewelry | Iowa Code § 627.6(1)(b) Iowa Code § 627.6(1)(a) | $3,000.00 $2,000.00 | $5,000.0 |
| Miscellaneous jewelry. | Iowa Code § 627.6(1)(b) | $1,000.00 | $1,000.0 |
| Life insurance policy with minimal Cash Surrender Value due to loans taken to pay premiums (Death benefit $80,000) | Iowa Code §627.6(6) | 100% | 1.0 |
| Estimated State & Federal Income Tax refunds | Iowa Code § 627.6(10) | 2,000.00 | $30,000.0 |
| 2006 Chrysler 300 SRT automobile | Iowa Code § 627.6(9) | 7,000.00 | $13,939.0 |
| | Total: | 399,501.00 | $435,985.0 |

## Exhibit 3
## Plan Projection

An estimated $756,612 in Plan funding is needed to pay for (a) the $60,000 in estimated Class 1 Administrative Claims, the $14,516 Class 6 Claim, and (c) the $682,096 in Class 9 Claims.

| Year 1 | Jul 2014 | Aug 2014 | Sep 2014 | Oct 2014 | Nov 2014 | Dec 2014 | Jan 2015 | Feb 2015 | Mar 2015 | Apr 2015 | May 2015 | Jun 2015 | Total | Cumulative |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Salary Deposits | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 60,000 | |
| Surplus Cash | | 33,000 | | | | | | | | | | | 33,000 | |
| Tax Refunds | | 40,000 | | | | | | | | | | | 40,000 | 133,000 |

| Year 2 | Jul 2015 | Aug 2015 | Sep 2015 | Oct 2015 | Nov 2015 | Dec 2015 | Jan 2016 | Feb 2016 | Mar 2016 | Apr 2016 | May 2016 | Jun 2016 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Salary Deposits | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 60,000 | |
| Tax Refunds | | | | | | | | | | | | | | |
| Sale of IL Home | | | Unknown | | | | | | | | | | | 193,000 |

| Year 3 | Jul 2016 | Aug 2016 | Sep 2016 | Oct 2016 | Nov 2016 | Dec 2016 | Jan 2017 | Feb 2017 | Mar 2017 | Apr 2017 | May 2017 | Jun 2017 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Salary Deposits | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 60,000 | |
| Sale of Nursing Homes | | 1,000,000[6] | | | | | | | | | | | 1,000,000 | |
| Tax Refunds | | | | | | | | | | | | | | 1,253,000 |

| Year 4 | Jul 2017 | Aug 2017 | Sep 2017 | Oct 2017 | Nov2 017 | Dec 2017 | Jan 2018 | Feb 2018 | Mar 2018 | Apr 2018 | May 2018 | Jun 2018 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Salary Deposits | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 60,000 | |
| Tax Refunds | | | | | | | | | | | | | | 1,313,000 |

| Year 5 | Jul 2018 | Aug 2018 | Sep 2018 | Oct 2018 | Nov 2018 | Dec 2018 | Jan 2019 | Feb 2019 | Mar 2019 | Apr 2019 | May 2019 | Jun 2019 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Salary Deposits | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 60,000 | |
| Tax Refunds | | | | | | | | | | | | | | 1,373,000 |

---

6  Nursing Homes in the Iowa have recently sold for $60,000 per bed. The Nursing Homes currently have 190 active beds. If the Nursing Homes could be sold for $60,000 per bed, the gross sales proceeds of the Nursing Home would be $11.4 million, from with the Nursing Homes' creditors' claims of approximately $5,000,000 would be paid, leaving a net balance of $6.4 million for distribution to the Nursing Homes' shareholders. The Debtors own 66.66% of the shares of the Nursing Homes, which would mean that, under these assumptions, the Debtors' share of the sale proceeds would be $4,266,666. Given an adequate opportunity to increase the Nursing Homes' occupancy rate, stabilize its operations and market the Nursing Homes in an orderly fashion, the Debtors hope to sell the homes for $60,000 per bed, or perhaps more. However, even if they are not able to realize such a sales price, if the Nursing Homes can only be sold for only $35,000 per bed, the Debtors' net share of such proceeds would be $1,099,890, which would be more than sufficient to fully fund the Plan. Thus, the Debtors believe that the Claims of the Debtors' Creditors will be paid in full under the Plan.

Rhoads Second Modified First Amended 9 2 14

**Exhibit 4**
**Liquidation Analysis of the Debtor's Assets**

|  | Value | Liens | Exemption | Liquidation Value |
|---|---|---|---|---|
| Home in Hawthorn Woods, IL | 277,500 | (277,518) | 0 | 0 |
| Home in Muscatine, IA | 366,000 | (260,000) | (366,000) | 0 |
| Cash | 120 |  |  | 120 |
| Jerry's checking account | 3,545 |  | (2,000) | 1,545 |
| Jerry's savings account | 838 |  |  | 838 |
| Sharon's checking account | 8,269 |  |  | 8,269 |
| Joint checking account | 500 |  |  | 500 |
| Misc. household goods & furnishings | 10,000 |  | (10,000) | 0 |
| Art objects | 2,500 |  | (2,500) | 0 |
| Jerry's clothing | 500 |  | (500) | 0 |
| Sharon's clothing | 500 |  | (500) | 0 |
| Fur Coat | 3,000 |  | (3,000) | 0 |
| Jewelry | 6,000 |  | (6,000) | 0 |
| Life ins. policy | 1 |  | (1) | 0 |
| 66.66% of Caregiver Mgmt. | 0 |  |  | Unknown |
| 66.66 % of All American | 0 |  |  | Unknown |
| 66.66% of Rhoads Health Care Group, Inc. | 0 |  |  | 0 |
| 100% of Caregiver Properties, LLC | 1 |  |  | 0 |
| 66.66% of All American Care Centers, Inc. | 0 |  |  | 0 |
| Estimated Federal Income Tax refund | 30,000 |  | (2,000) | 28,000 |
| Estimated State Income Tax refund | 10,000 |  |  | 10,000 |
| Claims against Dept. of Insp. & Appeals | Unknown |  |  | Unknown |
| Water damage insurance claim | Unknown |  |  | Unknown |
| 2006 Chrysler 300 SRT automobile | 13,939 |  | (7,000) | 6,939 |
| 2008 Mazda automobile | 10,622 |  | (14,516) | 0 |
| Misc. furniture, supplies & equip. | 500 |  |  | 500 |
| Equity interest in Timeshare, Cabo/Mexico | 35,000 |  |  | 35,000 |
| **Totals** | **779,335** | **(537,518)** | **(414,017)** | **91,711** |

**Exhibit 5**
**Disposable Monthly Income**

| Income | Jerry | Sharon | Combined | |
|---|---|---|---|---|
| Gross Monthly Income | $11,000 | $6,500 | $17,500 | |
| Monthly Tax Deductions | ($800) | ($478) | ($1,278) | |
| Net Monthly Income | $10,200 | $6,022 | $16,222 | |
| Social Security | $1,850 | $1,508 | $3,358 | |
| Housing Subsidies | $2,500 | $0 | $2,500 | |
| Total Monthly Net Income | $14,550 | $7,530 | $22,080 | $22,080 |
| **Expenses** | | | | |
| Rental Home Ownership | | | | ($2,500) |
| Real estate taxes | | | | ($600) |
| Property, homeowner's, or renter's insurance | | | | ($175) |
| Home maintenance, repair, and upkeep expenses | | | | ($150) |
| Homeowner's association or condominium dues | | | | ($10) |
| | | | | |
| Electricity, heat, natural gas | | | | ($400) |
| Water, sewer, garbage collection | | | | ($400) |
| Telephone  services | | | | ($300) |
| Other. Specify: Hawthorn Woods | | | | ($300) |
| Food and housekeeping supplies | | | | ($1,200) |
| Clothing, laundry, and dry cleaning | | | | ($800) |
| Personal care products and services | | | | ($150) |
| Medical and dental expenses | | | | ($500) |
| Transportation | | | | ($850) |
| Entertainment | | | | ($300) |
| Charitable contributions | | | | ($150) |
| Life insurance | | | | ($175) |
| Health insurance | | | | ($240) |
| Vehicle insurance | | | | ($350) |
| Car payments for Vehicle 1 | | | | ($369) |
| Mortgage on other property | | | | ($4,229) |
| Real estate taxes | | | | ($1,000) |
| Property insurance | | | | ($200) |
| Maintenance  expenses | | | | ($1,000) |
| Homeowner's association | | | | |
| Real estate taxes on vacant Florida lot | | | | ($142) |
| | | | | ($546) |
| Net income without Hawthorn Woods expenses | | | | $5,044 |
| Plan Payments | | | | ($5,000) |
| Monthly Surplus | | | | $44 |